**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**


**DEBORAH P. BARRINGTON,**

      **Plaintiff,**

**vs.**                        **Case No. 4:12cv258-MW/CAS**

**CAROLYN W. COLVIN,**[1]
**Acting Commissioner of Social Security,**

      **Defendant.**

_____/


## REPORT AND RECOMMENDATION

This is a Social Security case referred to the undersigned United States Magistrate

Judge for a report and recommendation pursuant to 28 U.S.C. § 636(b) and Local Rule

72.2(D).   It is now before the Court pursuant to 42 U.S.C. § 405(g) for review of the final

determination of the Commissioner of the Social Security Administration (SSA) denying

Plaintiff's application for Disability Insurance Benefits (DIB).   After careful consideration

of the entire Record, it is recommended that the decision of the Commissioner be

affirmed.

---

[1]   Carolyn W. Colvin became the Acting Commissioner of Social Security on
February 14, 2013.   Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure,
Carolyn W. Colvin is substituted for Michael J. Astrue as the Defendant in this case.

## I. Procedural Status of the Case

On March 12, 2008, Plaintiff, Deborah P. Barrington, filed a Title II application for a period of disability and DIB alleging disability beginning July 30, 2005, due to degenerative disc disease, right shoulder injury, left side and back pain, high blood pressure, diabetes, and depression.   R. 19, 74-75, 79, 145-51, 174.[2]   (Citations to the Record shall be by the symbol "R." followed by a page number that appears in the lower right corner.)   Plaintiff's last date of insured status for disability benefits is December 31, 2007.   R. 19.

Plaintiff's claim was denied initially on July 14, 2008, and on reconsideration on September 17, 2008.   R. 19, 74-79, 83-86.   Plaintiff requested a hearing.   R. 19, 89-90. On December 6, 2010, the evidentiary hearing was held in Tallahassee, Florida.   R. 19, 33-72.   Plaintiff was represented by David Sullivan, an attorney.   R. 19, 35, 30-82. Plaintiff testified.   R. 19, 34-65.   Melissa T. Brooks testified as a vocational expert. R. 19, 35, 65-71, 111-12 (Resume).

On January 17, 2011, Administrative Law Judge (ALJ) Charles Wm. Dorman entered his decision concluding that Plaintiff is not disabled.   R.19-27.   On January 27, 2011, Plaintiff sought review of the ALJ's Decision with the Appeals Council.   R. 14-15. On February 17, 2012, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner.   R. 6-9.   After receiving an extension of time, R. 1-5, on May 22, 2012, Plaintiff filed a complaint and seeks judicial

---

[2]   During the administrative hearing, Plaintiff amended her alleged disability onset date to March 12, 2007, less than one year prior to the expiration of her insured status. R. 37.

review of the decision.   Doc. 1.   Both parties filed memoranda of law, which have been

considered.   Docs. 12 and 14.   After careful consideration of the entire Record, it is

recommended that the decision of the Commissioner be affirmed.

## II.  Legal Standards Guiding Judicial Review

This Court must determine whether the Commissioner's decision is supported by

substantial evidence in the record and premised upon correct legal principles.

42 U.S.C. § 405(g); Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986).   "Substantial

evidence is more than a scintilla, but less than a preponderance.   It is such relevant

evidence as a reasonable person would accept as adequate to support a conclusion."

Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted); accord

Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005).   "The Commissioner's factual

findings are conclusive if supported by substantial evidence."   Wilson v. Barnhart, 284

F.3d 1219, 1221 (11th Cir. 2002) (citations omitted).[3]

"In making an initial determination of disability, the examiner must consider four

factors: '(1) objective medical facts or clinical findings; (2) diagnosis of examining

---

[3]  "If the Commissioner's decision is supported by substantial evidence we must
affirm, even if the proof preponderates against it."   Phillips v. Barnhart, 357 F.3d 1232,
1240, n.8 (11th Cir. 2004) (citations omitted).   "A 'substantial evidence' standard,
however, does not permit a court to uphold the Secretary's decision by referring only to
those parts of the record which support the ALJ.   A reviewing court must view the entire
record and take account of evidence in the record which detracts from the evidence relied
on by the ALJ."   Tieniber v. Heckler, 720 F.2d 1251, 1253 (11th Cir. 1983).   "Unless the
Secretary has analyzed all evidence and has sufficiently explained the weight he has
given to obviously probative exhibits, to say that his decision is supported by substantial
evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole
to determine whether the conclusions reached are rational.'"   Cowart v. Schweiker, 662
F.2d 731, 735 (11th Cir. 1981) (citations omitted).

physicians; (3) subjective evidence of pain and disability as testified to by the claimant and corroborated by [other observers, including family members], and (4) the claimant's age, education, and work history.'" Bloodsworth, 703 F.2d at 1240 (citations omitted).

A disability is defined as a physical or mental impairment of such severity that the claimant is not only unable to do past relevant work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). A disability is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see* 20 C.F.R. § 404.1509 (duration requirement). Both the "impairment" and the "inability" must be expected to last not less than 12 months. Barnhart v. Walton, 535 U.S. 212 (2002). In addition, an individual is entitled to DIB if she is under a disability prior to the expiration of her insured status. *See* 42 U.S.C. § 423(a)(1)(A) and (d); Torres v. Sec'y of Health & Human Servs., 845 F.2d 1136, 1137-38 (1st Cir. 1988); Cruz Rivera v. Sec'y of Health & Human Servs., 818 F.2d 96, 97 (1st Cir. 1986); SSR 83-20 (Policy Statement).

The Commissioner analyzes a claim in five steps. 20 C.F.R. § 404.1520(a)(4)(i)-(v):

1.  Is the individual currently engaged in substantial gainful activity?

2.  Does the individual have any severe impairments?

3.  Does the individual have any severe impairments that meet or equal those listed in Appendix 1 of 20 C.F.R. Part 404, Subpart P?

4.   Does the individual have any impairments which prevent past relevant work?

5.   Do the individual's impairments prevent other work?

A positive finding at step one or a negative finding at step two results in disapproval of the application for benefits.   A positive finding at step three results in approval of the application for benefits.   At step four, the claimant bears the burden of establishing a severe impairment that precludes the performance of past relevant work.   Consideration is given to the assessment of the claimant's RFC and the claimant's past relevant work. If the claimant can still do past relevant work, there will be a finding that the claimant is not disabled.   If the claimant carries this burden, however, the burden shifts to the Commissioner at step five to establish that despite the claimant's impairments, the claimant is able to perform other work in the national economy in light of the claimant's RFC, age, education, and work experience.   Phillips, 357 F.3d at 1237; Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999); Chester, 792 F.2d at 131; MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986); 20 C.F.R. § 404.1520(a)(4)(v), (e) & (g).   If the Commissioner carries this burden, the claimant must prove that he or she cannot perform the work suggested by the Commissioner.   Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

## III.  Findings of the ALJ

The ALJ made several findings relative to the issues raised in this appeal:

1.   Plaintiff "last met the insured status requirements of the Social Security Act on December 31, 2007."   R. 21.

2. Plaintiff "did not engage in substantial gainful activity during the period from her alleged onset date of July 30, 2005, through her date last insured of December 31, 2007." R. 21; *but see* n.2 (amended alleged onset date).

3. "Through the date last insured, [Plaintiff] had the following severe impairments: degenerative disk disease, degenerative joint disease, status post right rotator cuff repair and manipulation for adhesive capsulitis." R. 21.

4. "Through the date last insured, [Plaintiff] did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1." R. 22.

5. "[T]hrough the date last insured, [Plaintiff] had the residual functional capacity [RFC] to perform sedentary work as defined in 20 CFR 404.1567(a) except that she could only occasionally balance, stoop, kneel, crouch, crawl or climb; could occasionally reach overhead with her right upper extremity; and must avoid concentrated exposure to workplace hazards." R. 22.

6. "Through the date last insured, [Plaintiff] was unable to perform any past relevant work." R. 26.

7. Plaintiff "was born on July 7, 1955, and was 52 years old, which is defined as an individual closely approaching advanced age, on the date last insured." R. 26.

8. Plaintiff "has at least a high school education and is able to communicate in English." R. 26.

9. "Considering [Plaintiff's] age, education, work experience, and [RFC], [Plaintiff] had acquired work skills from past relevant work that were transferable to other occupations with jobs existing in significant numbers in the national economy," such as receptionist, data examination clerk, and information clerk, all sedentary and semi-skilled jobs. R. 26, 67.

10. Plaintiff was not under a disability at any time from July 30, 2005, the alleged onset date, through December 31, 2007, the date last insured. R. 27; *but see supra* n.2.

## IV. The Medical and Other Evidence

### A. Prior to the Date Last Insured (December 31, 2007)

In 2005, Plaintiff injured her right shoulder and back during a slip and fall incident.

R. 246; *see infra* n.4. On August 1, 2005, Plaintiff saw Oretha Jones, ARNP, for Esaias F. Lee, Jr., M.D., after slipping and "nearly" falling on a wet floor at a hotel. *See infra* n. 4 (Plaintiff's description of the accident). Plaintiff reported lower back pain that was increasing. Darvocet-N was prescribed. R. 246. (Plaintiff was treated by Dr. Lee and others within the medical group from approximately March 31, 2004, to August 2, 2007. R. 244-311.)

X-rays of Plaintiff's lumbar spine done on August 2, 2005, indicated degenerative spurring at multiple lumbar levels and throughout the thoracic region with calcification of the abdominal aorta. No acute bony abnormality was identified. R. 268.

On September 2, 2005, Plaintiff saw Dr. Lee for continued pain in her right hand, wrist, shoulder, and back after her recent fall. Dr. Lee noted the right hand was slightly swollen with decreased range of motion; the right shoulder was tender with decreased range of motion; and Plaintiff's back was tender with pain on palpation. Bruises were also noted on the right hand, wrist, right shoulder, and lower back. Vytorin was prescribed. R. 246.

A November 8, 2005, X-ray of the cervical spine revealed moderate spondylosis without acute injury detected. R. 267. A November 17, 2005, cervical spine MRI identified mild cervical and upper thoracic spondylosis with no cord compression or significant spinal stenosis or foraminal narrowing. There were a few small focal central disc bulges, most notably at C5-C6, but also at C3-C4 and C4-C5. R. 266.

On January 11, 2006, Plaintiff saw neurosurgeon Mark J. Cuffe, M.D., due to right shoulder and lower back pain radiating into her right foot. R. 327, 383. On examination,

Plaintiff had pain on abduction of the right arm at the shoulder, reduced pinprick sensation at both thumbs and index/small fingers, and reduced but symmetrical reflexes of the upper extremities, knees, and ankles.   Plaintiff had no clubbing, cyanosis, or edema. Motor examination was normal; straight leg lift was negative.   Plaintiff had midline tenderness in the lower lumbar region.   R. 328-29, 384-85.   Dr. Cuffe opined that Plaintiff's back pain was likely myofascial secondary to her lumbar sprain/strain with referral into the right lower extremity.   He doubted Plaintiff was suffering from surgical pathology, but ordered a lumbar MRI without contrast to rule out any potential surgical pathology, such as a disc herniation on the right.   He opined that the right shoulder pain may be due to an impingement syndrome or rotator cuff tear, but was not likely related to nerve compression in her cervical spine, and ordered a shoulder MRI without contrast. Daypro was prescribed.   R. 329-30, 385-86.

A January 18, 2006, right shoulder MRI revealed a small amount of fluid in the subacromial-subdeltoid bursa, which may be within normal limits but could represent a bursitis.   Hypertrophic changes at the AC joint were noted.   No rotator cuff tear was seen.   R. 331, 387.   An MRI of Plaintiff's lumbar spine showed a diffuse broad-based disc bulge with a mild left and right foraminal narrowing at L5-S1, but no significant spinal stenosis.   There is also mild disc desiccation and a diffuse broad-based disc bulge along with a mild to moderate bilateral facet osteoartropathy and minimal triangulation of the spinal canal.   There is a mild left and mild to moderate right foraminal narrowing as foraminal bulging that is slightly more pronounced on the right.   Dr. Cuffe reviewed both MRIs.   He opined that the lumbar MRI revealed what appeared to be a focal disc

protrusion on the right side at L5-S1 which certainly could be causing some compression of the right S1 nerve root.   He felt that some of her symptoms, however, particularly her lower back pain, may be myofascial in origin.   His impression was possible left S1 radiculopathy secondary to HNP on the right side at L5-S1.   Recommendations were discussed including a right L5-S1 hemilaminotomy with discectomy later.   He explained that any surgery would be in the hope of alleviating the radicular pain in the right leg, and not to cure the lower back pain.   R. 333-34.   He also discussed Plaintiff undergoing lumbar epidural steroid injections versus treatment with anti-inflammatory medications. R. 332-34, 388, 390.

On March 20, 2006, Plaintiff presented to Dr. Lee with right shoulder pain; possible rotator cuff injury.   Pain medications were continued with MRI to be done.   R. 245.

A March 23, 2006, cervical spine MRI revealed a small central and slightly right-sided extruded disc suspected at C5-6, causing mild compression on the ventral aspect of the cervical cord and with mild canal narrowing at the same level.   R. 241, 263. A small disc material protrusion at C4-5 also contacted the thecal sac with fluid collection in the bursa mildly distending the muscle and probably small cysts in the right humeral bone marrow.   There was no spinal stenosis at this level.   R. 241, 263.   On the same day, a right shoulder MRI indicated a likely full thickness tear involving the supraspinatus tendon.   Plaintiff had degenerative changes of the right AC joint capsule with spurring causing impression on the subacromial bursa.   R. 264.

On March 31, 2006, Plaintiff was referred back to Dr. Cuffe.   R. 245.   On April 24, 2006, Dr. Cuffe could not detect any new neurological deficits during Plaintiff's physical

examination.   R. 392.   Plaintiff still had significant pain on abduction of the right arm at the shoulder.   She also had tenderness over the right shoulder.   Dr. Cuffe opined that a lot of her right upper extremity pain was related to the right shoulder pathology and he referred Plaintiff to an orthopedic surgeon, Mark E. Fahey, M.D.   Plaintiff had negative straight leg lifts bilaterally.   R. 393.   Dr. Cuffe also reviewed Plaintiff's March 23, 2006, cervical MRI that revealed previously-noted small midline disc protrusion at C5-6 and further noted that this "is in no way causing spinal cord or nerve root compression, however particularly on the right."   R. 393.   Dr. Cuffe also noted that the shoulder MRI revealed a likely complete tear of the right supraspinatus tendon.   Plaintiff continued to report lower back pain radiating into her right leg.   Dr. Cuffe opined that a lot, if not all, of it was myofascial and that surgical intervention would not alleviate her pain.   R. 337, 392-93.   Dr. Cuffe also noted that Plaintiff denied back pain.   R. 392.

On May 8, 2006, X-rays were positive for mild degenerative changes of the left knee in the medial compartment, and at the L4-L5 and L5-S1 spine disc spaces and facet joints.   There was no abnormality to the hips or left femur.   R. 239, 262.

A May 31, 2006, lumbar spine MRI revealed a small right-sided protrusion of disc material at L4-5 superimposed on a bulging disc with facet joint arthropathy and narrowing of the neural foramina causing mild spinal stenosis.   An annular bulging disc at L5-S1 with facet joint arthropathic change caused some narrowing of the bilateral neural foramina.   R. 242, 258.   On the same day, an MRI of the left hip identified mild degenerative change of the bilateral hip joints with subtle spurring.   R. 240, 259.

On June 20, 2006, Plaintiff saw orthopedic surgeon Dr. Fahey for right shoulder pain due to a rotator cuff tear that was consistent with her injury.    Surgical repair was deemed necessary.    R. 433.

On July 6, 2006, Dr. Lee prescribed Lorcet for hip pain.    R. 245.    On September 11, 2006, Plaintiff saw Dr. Lee complaining of "multiple pains everywhere" and was prescribed Cymbalta.    R. 244.

On October 9, 2006, Plaintiff underwent a right shoulder rotator cuff repair with acrimioplasty and Mumford distal clavicle excision due to her right shoulder rotator cuff tear and acrimioclavicular arthritis.    R. 348-51.

On October 26, 2006, Vildan Mullin, M.D., a pain management specialist, administered two lumbar epidural steroid injections at L4-L5.    R. 272, 399.    Plaintiff followed-up with Dr. Mullin on November 6, 2008, and reported no benefit from the steroid injections.    R. 339-42.    Dr. Mullin's impressions were low back and leg pain secondary to lumbar disc degeneration and herniation.    He did not recommend any type of injection therapy.    He recommended to Plaintiff that she see Dr. Cuffe if the pain increases. R. 342.

On January 29, 2007, Plaintiff first saw Thomas G. Serio, M.D., for treatment of her medical problems including type 2 diabetes mellitus, hypertension, and low back pain. R. 440.    Plaintiff also reported new hip pain, and was finishing a course of physical therapy.    Plaintiff was "pleasant, conversive in no apparent distress."    R. 440; *see* n.4. Upon examination, Dr. Serio noted tenderness over the sacroiliac joint and over the sacrum radiating into the gluteal muscles with a positive straight leg test.    Tylenol #3,

Mobic, and Robaxin were prescribed for back pain, and Glucophage was refilled for diabetes, and Avalide refilled for hypertension.   R. 440.

On March 21, 2007, Plaintiff had X-rays showing nine views of her cervical spine, which did not demonstrate any evidence of an acute bone fracture or mal-alignment. R. 442.

On March 22, 2007, Dr. Serio noted Plaintiff was in obvious discomfort, sitting with a "funny posture" and had difficulty getting out of a chair and onto the examination table. Plaintiff was also walking gingerly.   Upon examination, Plaintiff had muscle spasms and tenderness in her neck and decreased upper extremity range of motion due to pain. Plaintiff reported difficulty walking or sitting for extended periods of time, and reported fatigue and sleepy spells with Robaxin.   Skelaxin was substituted.   Physical therapy was prescribed and a long term disability parking permit was provided.   R. 439.

On April 13, 2007, Plaintiff informed Dr. Serio her back pain was improving and Dr. Serio noted no costovertebral tenderness regarding her back.   R. 438.[4]   By June 20, 2007, however, she reported her back pain with radiculopathy was getting worse as she was having difficulty obtaining Mobic through her insurer.   R. 437.   Dr. Serio observed that Plaintiff was in obvious discomfort, walking with a cane in discomfort, and having

---

[4]   The ALJ referred to this patient note and Plaintiff telling Dr. Serio her back pain was improving and Dr. Serio noting that Plaintiff had "[n]o problems at all."   R. 24, 438. The ALJ does not refer to Dr. Serio's June 20, 2007, note that follows or other past and future patient notes, except when he referred to Exhibit 13F and stated that Dr. Serio mentioned Plaintiff "appeared to be in no apparent distress," R. 24, an observation made by Dr. Serio in subsequent patient notes.   R. 24; *see infra* at 13.   The ALJ next referred to Dr. Serio when discussing Dr. Serio's December 2010, residual RFC questionnaire in some detail and reference in passing to Dr. Serio's August 2008 and April 2010 other residual RFC assessments.   R. 24-25.

difficulty getting up from the chair and onto the examination table.   Plaintiff experienced

pain with palpation of the lower back and with testing of the lower extremities.   Straight

leg raising is 10 degrees on the left and 30 degrees on the right.   Deep tendon reflexes

are 1+ bilaterally in the lower extremities.   A Toradol shot for pain was given.   R. 437.

A June 21, 2007, lumbar spine MRI revealed a small protrusion of disc material at

L4-5 superimposed on a bulging disc with facet joint arthropathy and narrowing of the

neural foramina causing mild to moderate spinal stenosis, slightly progressed since the

May 31, 2006, study.   An annular bulging disc at L5-S1 with facet joint arthropathic

change caused some narrowing of the bilateral neural foramina.   R. 291.

On July 13, 2007, Dr. Serio saw Plaintiff for continuing problems with her back, and

she reported a lot of pain with tingling and numbness into her foot.   R. 436.   Tylenol #3

and Elavil were prescribed, in addition to a referral to neurosurgery.   (Neurology would

not see her.)   Dr. Serio noted again, as he did in April 2007, *see supra* n.4, that Plaintiff

was "conversive in no apparent distress."   R. 436; *see* R. 440 (Jan. 29, 2007 "conversive

in no apparent distress"); R. 438 (Apr. 13, 2007 (same)); R. 435 (Feb. 11, 2008 (same));

525 (May 12, 2008 (same)); R. 522 (Mar. 11, 2009 (same)); R. 521 (Apr. 27, 2009

(same)); R. 520 (July 30, 2009 (same)).   Dr. Serio also noted "no CVA tenderness"

regarding her back and regarding her extremities--"within normal limits x4 for range of

motion, sensory, deep tendon reflexes, pulses, and edema."   R. 436.

On July 30, 2007, Plaintiff saw Dr. Cuffe for ongoing lower back and left leg pain.

She reported the epidural steroid injections were not effective, and Tylenol with codeine,

Vicodin, and Mobic helped somewhat.   On examination, Plaintiff had give-way weakness

in both lower extremities, an antalgic gait, and reduced but equal reflexes at her knees and ankles.   R. 325.   Dr. Cuffe opined that there was not likely anything he could offer from a neurosurgical standpoint, but requested the actual MRI films to review personally before he could render "an adequate neurological opinion."   He did not feel that at least two prior lumbar MRI scans that he reviewed revealed evidence of neurological pathology, such as left-sided nerve root impingement.   R. 326.

An August 2, 2007, lumbar spine MRI identified mild degenerative disc disease in the lumbar spine, but no significant spinal stenosis; moderate left and mild right L5-S1 neural foraminal stenosis; left lateral L5-S1 and right lateral L4-L5 annular fissures. R. 289.

On August 6, 2007, Plaintiff saw Dr. Cuffe for continued lower back and left leg pain.   R. 312-16, 368-377.   On examination, Plaintiff had give-way weakness in both lower extremities and reduced but equal reflexes at the knees and ankles.   She had a negative straight leg lift bilaterally.   Dr. Cuffe reviewed the updated lumbar MRI scan that revealed what he described "as mild (if any at all) lumbar stenosis at L4-5 due to bilateral L4-5 facet hypertrophy."   He did "not see any evidence of nerve root impingement on the left at this or any other level."   Plaintiff's "alignment is anatomic without evidence of spondylolisthesis at any disc space."   R. 315, 371.   Regarding lower back pain, Dr. Cuffe noted that he told Plaintiff again that he did not see any evidence whatsoever of neurosurgical pathology on her present lumbar MRI scan.   He opined that Plaintiff had exhausted all treatment options with the exception of a possible dorsal column stimulator, and referred her back to pain management with Dr. Mullin.   R. 316, 372.

On August 21, 2007, Plaintiff had a bone density study of her lumbar spine, left hip, and neck with normal results.   R. 343-44.

On September 4, 2007, Plaintiff reported remaining right shoulder stiffness and difficulty with activities despite physical therapy.   R. 353, 421.   Dr. Fahey opined that Plaintiff "just seems to have a stiffness wall and difficulties with activities."   Therapy had been pushed.   Plaintiff continued with stretching and with activities.   One option was to do a manipulation under anesthesia and attempt to break loose adhesions that may give Plaintiff better motion and improvement.   R. 353, 421.   The right shoulder manipulation under anesthesia for adhesive capsulitis was done on September 12, 2007.   R. 419.

On October 9, 2007, Plaintiff again underwent surgery for right shoulder rotator cuff repair with acrimioplasty and Munford distal clavicle excision.   Plaintiff was discharged home on October 11, 2007.   R. 348-49, 427-31.

On October 15, 2007, Dr. Mullin implanted a spinal cord stimulator on a trial basis. R. 346, 409.   On October 18, 2007, Plaintiff saw Dr. Mullin reporting severe pain in her back and left hip, and leg with loss of bladder control.   The stimulator was removed and Dr. Mullin opined that the best approach was to use Vicodin 5 mg three times a day for reasonable pain control and to return on an as needed basis.   R. 414-16.

On October 23, 2007, Dr. Fahey wrote a letter explaining that Plaintiff never got her right shoulder motion back and had maintained stiffness of her shoulder that was more than expected.   R. 417.   He opined that the shoulder injury was related to her accident (2005 fall), and in three months she probably would reach maximum medical improvement.   Dr. Fahey thought Plaintiff had "sustained permanent injury and even in

the best of situations she will have some loss of range of motion and she may have some persistent aching pain." R. 417. Dr. Fahey opined, with respect to Plaintiff's shoulder, she should be able to return to work with some limitations, and secretarial work, sewing, and light catering activities were probably reasonable. Any lifting of heavy trays, pots or pans, or any overhead work, however, should be problematic. R. 417.

### B. Subsequent to the Date Last Insured (December 31, 2007)

On February 11, 2008, Plaintiff went to Dr. Serio for continued evaluation. She was tolerating her medications well and "conversive in no apparent distress," but still had problems with her back. *See supra* n.4. Plaintiff reported not getting much relief from her first specialist. R. 435. Dr. Serio referred Plaintiff to Dr. Arcos for a second opinion and treatment of her neuroforaminal stenosis. R. 435.

A May 8, 2008, left lower extremity venous Doppler ultrasound was deemed normal. R. 238.

On May 12, 2008, Dr. Serio noted that Plaintiff's chronic pain syndrome was symptomatic, and worse with missed doses of Mobic. She was taking Vicodin, and when combined with Tylenol with codeine during the day she would get sleepy. Lyrica was prescribed for the chronic pain syndrome. R. 525.

On May 19, 2008, non-examining State agency physician Thomas Peele, M.D., performed a physical RFC assessment. He opined that Plaintiff was capable of performing light exertional activity with occasional postural limitations such as no more than occasional climbing, balancing, stooping, kneeling, crouching, and crawling, and no concentrated exposure to hazards. R. 448-55.

On June 18, 2008, Plaintiff was evaluated by psychologist John K. McKay, Ph.D., at the Commissioner's request. Dr. McKay opined that Plaintiff "does seem to be somewhat of a perfectionist and she may not cope very well with pain issues. Other than that, I do not see any possible psychological complications." There was no mental impairment found. Dr. McKay noted Plaintiff's complaints of pain, and her statement that she had even given up seamstress work at home due to the inability to sit longer than 15 minutes. Dr. McKay stated there was no mental diagnosis. There was no reason that Plaintiff could not manage her own funds and affairs. R. 456-57.

On July 14, 2008, non-examining State agency psychologist Thomas Conger, Ph.D., prepared a Psychiatric Review Technique (PRT) and opined that Plaintiff had no medically determinable mental impairment. R. 460.

On August 12, 2008, Dr. Serio noted that Plaintiff was still walking with a cane, having difficulty getting out of the chair and onto the examination table, and was experiencing shoulder pain. She also had a decreased range of motion in her right shoulder with abduction and external rotation. She was switched to Pravachol for cost concerns. R. 474, 524. On the same day, Dr. Serio completed a Residual Functional Capacity Questionnaire, opining that Plaintiff would not be able to stand or walk during the workday, and "cannot last entire hour" in a normal workday. R. 476. Dr. Serio explained that Plaintiff "cannot either sit or stand for an extended period." R. 477. He also noted she could not do lifting, and could not perform repetitive pushing and pulling with her hands, or use her feet for repetitive movements, but could use her hands for simple grasping and fine manipulation. R. 476. Plaintiff could reach above shoulder

level, "but not both hands." She was unable to bend, squat, crawl, and climb. R. 476.

Dr. Serio opined that Plaintiff's use of a hand-held assistive device was medically required for even occasional walking or standing and that she would not be able to sustain work activity for a regular 40 hour week. Dr. Serio also opined that Plaintiff has non-exertional impairments that would substantially restrict her ability to function, but none are expressly stated. R. 477.

On September 17, 2008, non-examining State agency physician Edward Holifield, M.D., completed a physical RFC assessment and indicated that he disagreed with the examining or treating source opinions, and instead opined that Plaintiff could perform light exertional activity. R. 478-85. On the same date, non-examining State agency psychologist Jane Cormier, Ph.D., completed a PRT and opined Plaintiff did not have a medically determinable mental impairment prior to Plaintiff's date last insured. R. 486, 498.

A September 30, 2008, abdominal X-ray noted degenerative disc disease of the lumbar spine. The impression was: no acute findings. R. 546.

On January 6, 2009, Plaintiff saw Dr. Serio and had continued difficulty with range of motion of the right shoulder and in "obvious discomfort." Dr. Serio noted that Plaintiff "does have a history of reflex sympathetic dystrophy … her pain is coming back in her lower extremities." Upon questioning, there "has been some non-compliance." Plaintiff had not been taking Lyrica due to cost, although she was still taking Vicodin twice daily and Tylenol with codeine during the day. Samples of Lyrica were provided for the

shoulder impingement and reflex sympathetic dystrophy. Tylenol with codeine was discontinued and Vicodin was increased.    R. 523, 568.

On March 11, 2009, Plaintiff followed-up with Dr. Serio (after an emergency room visit) for chest and flank pain, which had resolved and Plaintiff is reported as better. Regarding Plaintiff's back, Dr. Serio noted "no costovertebral angle tenderness." Plaintiff was "conversive in no apparent distress."   R. 522; *see supra* n. 4.

In March 2009, Plaintiff sought evaluation for intermittent chest discomfort. R. 501-16, 543, 547-49.   On October 13, 2009, after a cardiac evaluation including an echocardiogram and Doppler study, Ernesto Umana, M.D., noted that Plaintiff had very trivial pericardial effusion that did not require further evaluation.   R. 502.   He recommended aggressive control of Plaintiff's diabetes, blood pressure, and newly diagnosed hypothyroidism.   R. 501-16, 543, 547-49.

On April 27, 2009, Dr. Serio noted that Plaintiff had no myalgias or arthralgias. Plaintiff reported dysuria but no fever, chills, or back pain, no nausea, suprapubic pain or pressure.   Plaintiff was "conversive in no apparent distress."   R. 521; *see supra* n.4.

On July 30, 2009, Dr. Serio reported some radiculopathy per her history, but in "no apparent distress."   R. 520.

On November 3, 2009, Dr. Serio noted that Plaintiff was in obvious discomfort due to her left leg, and noted she "has Reflex sympathetic dystrophy and she is having some cramping pain in her legs."   Plaintiff also was noted to have myalgias, and her cholesterol medication was changed in an effort to reduce leg cramps.   R. 519, 564.

On December 22, 2009, Plaintiff had a urinary tract infection. She reported "some back pain and there is some abdominal and spring pain and tenderness. Symptoms are not resolving. Review of systems negative." R. 518, 563.

On April 23, 2010, Plaintiff saw Dr. Serio for continuing back, neck, hip, and right arm pain. R. 562. Plaintiff reported she was unable to work, could not stand or sit for more than an hour at a time before having to walk around, and had difficulty lifting and bending over. Upon examination, Dr. Serio noted Plaintiff walked with a cane, slightly leaning favoring the right arm, had neck tenderness with decreased range of motion, tenderness throughout the right shoulder, and was tender over the lower back. R. 562. On the same day, Dr. Serio completed a second Residual Functional Capacity Questionnaire, opining that Plaintiff was limited to standing and/or walking less than one hour during a workday due to pain, sitting less than two hours, and would need to use a cane. She could lift a maximum of ten pounds on an occasional basis, but could not bend, squat, crawl, or climb, and could reach overhead with her left arm only. Dr. Serio further opined that Plaintiff would not be able to sustain a 40-hour workweek, and would not be able to sustain activity at a pace and with the attention to task required in the competitive work environment. R. 560. Dr. Serio explained that Plaintiff's musculoskeletal condition restricted her function, and that the limitations stated would be present for the "indefinite" future, although he did not opine when Plaintiff's limitations began. R. 561; *compare* August 12, 2008, Residual Functional Capacity Questionnaire, R. 476-77.

On June 17, 2010, Dr. Serio noted that Plaintiff continued to report difficulty "getting up and around, standing and sitting for extended periods of time.   Really can't do much.   Difficulties with ambulation" and needed a cane to walk.   R. 601.   Plaintiff tolerated her medications well without any difficulties.   He observed Plaintiff to be in obvious discomfort, walking with a cane, and having difficulty getting up and out of chair onto the examination table.   Medications were continued for her chronic pain syndrome. R. 601.

On December 2, 2010, Dr. Serio completed a third Residual Functional Capacity Questionnaire, indicating that Plaintiff could stand and/or walk one hour and sit one hour but "cannot last the entire time" in an eight hour workday.   R. 615-16.   Unlike the other questionnaires, this one asked Dr. Serio to opine whether any impairments interfered with her ability to perform basic work activity "**on or before 12/31/07**."   R. 615 (emphasis in original); *compare* R. 560-61 (April 23, 2010) and R. 476-77 (August 12, 2008). Dr. Serio opined that she was unable to lift weight and push or pull with her hands or use her feet for repetitive movements.   She could not bend, squat, crawl, or climb, and could not reach above shoulder level with both hands.   She also required the use of a hand-held assistive device with occasional walking and standing, and could not be expected to sustain a 40-hour workweek.   R. 615.   Dr. Serio further explained that Plaintiff "cannot sit or stand for an extended period" and that the noted limitations existed from January 2007, when he first examined Plaintiff to "lifetime."   R. 616.

During closing argument, counsel advised the ALJ that Plaintiff's treating physician is Dr. Serio who she has "been treating with pretty consistently" and who filled-out several

RFC forms (Exhibits 20F, 25F, and 30F), reflecting that Plaintiff is not capable of sustaining an 8-hour-a-day, 40-hour-a-week workweek. Counsel also mentioned Plaintiff's back condition and that it "was serious enough that they actually did a trial for a spinal cord stimulator, which is [his] understanding is only done in cases where there is pretty severe pain, and [he thought] that that's indicative of the actual pain that she's in and the limitations that are placed on her." R. 71.

### C. Plaintiff's Hearing Testimony

During the hearing, Plaintiff, by counsel, amended her alleged onset date to March 12, 2007, *supra* note 2, one year before her DIB application was filed, rather than July 30, 2005, the date stated on her initial application. Counsel represented that the significance of the change was explained to Plaintiff. R. 36-41. The ALJ focused the party's attention on the events that transpired *prior* to December 31, 2007, Plaintiff's last date of Title II DIB coverage. R. 39-40.

Plaintiff testified that she fell on July 30, 2005, and that affected her back and sciatic nerve. R. 41.[5] As a result, her back pain shifted to her legs, neck, shoulders, and

---

[5] Plaintiff was not working at the time of the accident; she was retired. R. 62. She had worked primarily at the Disc Village, a drug and alcoholic treatment facility. She was the administrative assistant to the director and supervised perhaps four persons. Her administrative duties consisted of making appointments for the director; she typed correspondence and ordered supplies. R. 64, 235 (March 31, 1989-April 9, 2002). (Plaintiff also worked as a seamstress making clothes for different customers from June 2002 to June 2005. R. 235). While working, the heaviest thing she lifted was a box of supplies, perhaps 15 or 20 pounds. R. 63. Plaintiff described the accident. She was attending an anniversary for a church at a hotel. The ceramic floor had been mopped, but was still wet and she slipped and fell on a wet floor at the hotel. R. 54, 246. An incident report was filled out and she went home. She did not immediately go to the emergency room, but went several days later when the pain began. R. 54. There was a lawsuit and the case settled around 2007 or 2008. R. 54-56. As a result of the fall,

"the whole nine yards." R. 42. It prevented her from sitting and standing for long periods. She cannot lift any more than 5 to 10 pounds, such as her purse. Her back pain has increased. The pain was constant. R. 42. Pain was eight to ten on a ten-point scale. R. 42-43.

Plaintiff lived in the same one-story house between the summer of 2005 and the beginning of 2008. During this time, she lived there with her husband and one of her two daughters. Her husband was working at the time. She was home by herself during most of the day. R. 59. There were no steps. R. 60. In February 2008, they moved to another one-story house with two steps in front with a rail on the side. R. 61.

Prior to January 1, 2008, Plaintiff was capable of doing laundry and cooking some, although she did have some help. Her husband did most of the laundry and cooking with her daughter. She does some cooking, but is limited when lifting and bending. She can stand at the stove for about ten minutes and prepare a meal for a short period, but leaves it to her family to watch. Then she would have to sit down and elevate her legs. R. 43-44, 59-60. After standing for about ten minutes, she would experience "unbearable" pain in her back and legs. R. 44. Plaintiff has used a cane for about three years. R. 44. (The ALJ referred to a June 2007 note indicating that Plaintiff was using a cane on June 2007. R. 60; *see* R. 437 (Dr. Serio note).) She was able to sit for about 15 minutes before she would have to get up and move around a little to stretch her muscles, although the pain would be severely her back and legs cramping and her

---

Plaintiff had two surgeries on her right shoulder. R. 62-63.

hurting.   R. 45.   At that time, she was able to walk to her bedroom and back, less than

50 yards, and she would experience severe pain from her back to her legs.   R. 45-46.

Plaintiff tried several treatments for her back including injections, but they did not

work.   R. 46, 57-58.   She discussed surgery with Dr. Cuffe, but it was not performed and

that is when she was referred to the pain management doctor for the "neurostimulator" for

a trial period that did not help.   R. 47.

Plaintiff also described her shoulder problems prior to January 1, 2008.   Plaintiff

had surgery to repair a rotator cuff and a second surgery.   R. 47.   She was unable to

raise her shoulder to brush her hair, but could brush her teeth.   R. 48.   Plaintiff was

unable to make her bed and did a little driving to the grocery store with her husband.   She

could do some shopping in a grocery store and was able to move around while riding in a

cart.   R. 49.   Sometimes she went by herself and shopped for about ten to 15 minutes.

R. 49.   Before January 1, 2008, her husband helped her with everything including putting

on her pants and jacket.   R. 50.   At that time, she loved walking, sewing, dancing, and

other activities, but could not do those prior to January 1, 2008.   R. 51-52.[6]   She and her

husband also went to church, but she goes once in a while now.   R. 61-62.   At that time,

she was able to sleep for a couple of hours and then awaken to take medication.   She

would also lay down during the day for an hour or so and then sit in her recliner elevating

her legs most of the day.   R. 52-53.   The ALJ referred to a note the record that indicated

---

[6]   Back in November 2006, when she walked for exercise a couple of time a week,
she would walk "down the street a little bit, just like in front of [her] house or something,
just to move around or in [her] backyard or something like that."   (It is 50 yards from her
house to the mailbox.)   R. 55-56.

that during the summer of 2007, Plaintiff's pain was aggravated by walking and prolonged sitting.   Plaintiff described prolonged sitting as 30 minute to an hour.   R. 56-57.

From August 2005, she has traveled to Jacksonville to see a doctor.   She and her husband do not take vacations or travel outside the state.   R. 62.

### D.   Testimony of the Vocational Expert

Mellissa Brooks, the vocational expert, testified that Plaintiff's past relevant work was classified in the <u>Dictionary of Occupational Titles</u> (DOT) as administrative clerk, with a SVP of 4, semi-skilled, light.   R. 65.   Ms. Brooks testified that Plaintiff's past relevant work gave her transferable skills consisting of record-keeping, general clerking services, and information giving.   R. 66.   (Ms. Brooks provided a definition of transferable skills. R. 68-70.)   The ALJ asked Ms. Brooks whether there were occupations that could be performed by an individual with Plaintiff's vocational characteristics and RFC, and she testified that such an individual could work at the representative occupations of receptionist (SVP 4), data examination (SVP 3), and information clerk (SVP 4), comprising approximately 270,000 jobs in the national economy.   Each of these jobs is sedentary and semi-skilled.   R. 67.   These jobs would "require very little adjustment . . . from [Plaintiff's past relevant work."   "Only a slight amount, nothing more than that." R. 70.   Ms. Brooks stated that her testimony was consistent with the DOT.   R. 70-71. Ms. Brooks further opined that if a person, with a combination of impairments, were unable to successfully maintain sufficient concentration, persistence and pace to perform a 40-hour workweek, there would not be work that such a person could perform in the national economy.   R. 67.

## V.  Legal Analysis

### A.  The ALJ's determination that Plaintiff is not disabled is supported by substantial evidence.

Plaintiff's first argument is in two parts.   Doc. 12 at 13-17.   First, Plaintiff argues that the ALJ erred because he did not accord significant weight to Dr. Serio's opinions as Plaintiff's treating physician.   Second, Plaintiff argues that the ALJ accorded significant weight to the opinions of Dr. Fahey and Dr. Peele, but erred because he did not incorporate Dr. Fahey's opinion regarding Plaintiff's functional limitations and her restricted ability to do any overhead type of work when the vocational expert was presented with hypothetical questions.   Plaintiff also argues that the ALJ erred in crediting Dr. Peele's opinion.   In her second argument, Plaintiff argues that the ALJ erred when he made adverse credibility findings.   Doc. 12 at 17-19.   According to Plaintiff, these errors resulted in an erroneous RFC determination.

To establish entitlement to disability benefits, Plaintiff must show that she is unable to engage in any substantial gainful activity by reason of a medically determinable impairment which can be expected to end in death or that has lasted or can be expected to last for a continuous period of not less than 12 months.   Cannon v. Bowen, 858 F.2d at 1544.[7]   The relevant period in this case is rather short--approximately nine and one-half months--with an alleged amended onset date of March 12, 2007, and the expiration of Plaintiff's insured status on December 31, 2007, i.e., the relevant period.   *See* 20 C.F.R.

---

[7]   *See generally* Gonzalez v. Bowen, 715 F. Supp. 412 (D.P.R. 1988) (remanding case with instructions to evaluate, and if necessary develop, such evidence together with other evidence at hand and conclude whether or to what extent the claimant was able to engage in substantial gainful activity from the onset date to the date when insurance expired), *appeal after remand*, 757 F. Supp. 130 (D.P.R. 1991).

§ 404.130.   Thus, to be eligible for disability benefits under Title II, Plaintiff must establish that she was under a disability prior to the expiration of her insured status on December 31, 2007.   *See* docs. 12 at 2 and 14 at 2 n.1.

The opinion of the claimant's treating physician must be accorded considerable weight by the Commissioner unless good cause is shown to the contrary.   Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997).   This is so because treating physicians "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations."   20 C.F.R. § 416.1527(d)(2).

The reasons for giving little weight to the opinion of the treating physician must be supported by substantial evidence, Marbury v. Sullivan, 957 F.2d 837, 841 (11th Cir. 1992), and must be clearly articulated.   Phillips, 357 F.3d at 1241.   "The Secretary must specify what weight is given to a treating physician's opinion and any reason for giving it no weight, and failure to do so is reversible error."   MacGregor v. Bowen, 786 F.2d 1050, 1053 (11th Cir. 1986).

The ALJ may discount a treating physician's opinion report regarding an inability to work if it is unsupported by objective medical evidence and is wholly conclusory.   Edwards v. Sullivan, 937 F.2d 580, 583-84 (11th Cir. 1991).   Stated somewhat differently, the ALJ may discount the treating physician's opinion if good cause exists to do so.   Hillsman v. Bowen, 804 F. 2d 1179, 1181 (11th Cir. 1986).   Good cause may

be found when the opinion is "not bolstered by the evidence," the evidence "supports a

contrary finding," the opinion is "conclusory" or "so brief and conclusory that it lacks

persuasive weight," the opinion is "inconsistent with [the treating physician's own

medical records," the statement "contains no [supporting] clinical data or information,"

the opinion "is unsubstantiated by any clinical or laboratory findings," or the opinion "is

not accompanied by objective medical evidence."   Lewis, 125 F.3d at 1440; Edwards,

937 F.2d at 583 (citing Schnorr v. Bowen, 816 F.2d 578, 582 (11th Cir. 1987)).   A brief

and conclusory statement that is not supported by medical evidence, even if made by a

treating physician, is not persuasive evidence of disability.   Johns v. Bowen, 821 F. 2d

551, 555 (11th Cir. 1987).

Furthermore, the Commissioner considers "all evidence from nonexamining

sources to be opinion evidence."  20 C.F.R. § 404.1527(e).   When considered, the

rules in 20 C.F.R. § 404.1527(a)-(d) are applied.   20 C.F.R. § 404.1527(e).   In

addition, ALJ's "are not bound be any findings made by State agency medical or

psychological consultants, or other program physicians and psychologists.   20 C.F.R.

§ 404.1527(e)(2)(i).   On the other hand,

> State agency medical and psychological consultants and other program
> physicians, psychologists, and other medical specialists are highly qualified
> physicians, psychologists, and other medical specialists who are also experts in
> Social Security disability evaluation.   Therefore, [ALJ's] must consider findings
> and other opinions of State agency medical and psychological consultants and
> other program physicians, psychologists, and other medical specialists as
> opinion evidence, except for the ultimate determination about whether [the
> claimant is] disabled.   (see § 404.1512(b)(8)).

20 C.F.R. § 404.1527(e)(2)(i).   When considering these opinions, the ALJ evaluates

the findings

using the relevant factors in paragraphs (a) through (d) of this section, such as the consultant's medical specialty and expertise in our rules, the supporting evidence in the case record, supporting explanations the medical or psychological consultant provides, and any other factors relevant to weighing the opinions.   Unless a treating sources opinion is given controlling weight, the [ALJ] must explain in the decision to wait of a State agency medical or psychological consultant or other program physician, psychologist, or other medical specialist, as the [ALJ] must do for any opinions from treating sources, nontreating sources, and other nonexamining sources do not work for [the Social Security Administration].

20 C.F.R. § 404.1527(e)(2)(ii).

Through the date last insured, December 31, 2007, the ALJ determined that Plaintiff had several severe impairments, but that none of these impairments met or medically equaled one of the listed impairments, a point not contested.   R. 21-22. (The ALJ considered but rejected as non-severe other medical issues identified by Plaintiff.   R. 21.)

The ALJ determined, through the date last insured, that Plaintiff had the RFC to perform sedentary work, except that she could only occasionally balance, stoop, kneel, crouch, crawl, or climb; could occasionally reached overhead with her right upper extremity; and must avoid concentrated exposure to workplace hazards.   R. 22.   This determination is based on the ALJ's consideration of the relevant medical evidence as well as Plaintiff's credibility.   R. 22-26.

The ALJ begins his discussion on this issue with Plaintiff's description of the accident and resulting symptoms of pain and limited mobility.   R. 23.   Next, the ALJ discussed the medical evidence and concluded that "the objective findings in this case fail to provide strong support for the claimant's allegations of disabling symptoms and limitations."   R. 23.

An MRI of the claimant's spine performed just four months after her 2005 slip-and-fall showed only mild cervical and upper thoracic spondylosis with small disc bulges at C3-C-4, C-4-C5, and C5-C6, but no cord compression were significant spinal stenosis or foraminal narrowing (Ex. 2F23). William Yaakob, M.D., also reviewed nine images of the claimant's cervical spine and determined that each failed to demonstrate any evidence of any acute bony fracture or malalignment (Ex. 3F8). When the claimant nevertheless continued to allege pain, Dr. Vildan Mullin, M.D., provided lumbar epidural steroid injections to the claimant, which she said did not relieve her symptoms (Ex. 3F). However, in April 2007, the claimant told Dr. Serio that her back pain was improving and that she was experiencing "no problems at all" (Ex. 13F4). Dr. Serio likewise observed that the claimant appeared to be in no apparent distress (Ex. 13F). Subsequent bone densitometry tests of the claimant's neck and spine revealed normal findings (Ex. 7F1, 24F41). In September 2007, Dr. Mullin [sic] added, "I personally reviewed her new non-contrast lumbar MRI scan performed last week. In my opinion, the study reveals what I would describe as mild (if any at all) lumbar stenosis at L4-L5 due to bilateral L4-5 facet hypertrophy. However, I still do not see any evidence of nerve root impingement on the left at this or any other level" (Ex. 10F14 [Dr. Cuffe's Aug. 6, 2007, note, R. 371]). Dr. Mullin [sic] added, "[a]t this point, she has basically exhausted all other treatment options with the exception of a possible dorsal column stimulator," a remedy which the claimant also said was ineffective after a brief trial period. (Ex. 10F15 [Dr. Cuffe's note, R. 372], 11F17 [Dr. Mullin's Oct. 18, 2007, note, R. 416]).

R.23- 24. It was Dr. Cuffe, a treating neurosurgeon not Dr. Mullin, who on August 6, 2007, rendered his impressions of the MRI results. R. 371. Dr. Cuffe also observed regarding Plaintiff's low back pain: "As I told the patient once again, I still do not see any evidence whatsoever of neurosurgical pathology on her present lumbar MRI scan. She has, at most, bilateral L4-5 facet hypertrophy with minimal lumbar stenosis. However, I still do not see any evidence whatsoever of nerve root impingement on the left side at this time or any other level." R. 371. It was also Dr. Cuffe who opined that Plaintiff had exhausted all other treatment options with the exception of a possible dorsal column stimulator trial, R. 373, which was performed by Dr. Mullin on October 15, 2007. R. 346, 409, 414. Dr. Mullin noted during a follow-up examination,

post-simulator trial, that Plaintiff reported "severe pain in her back and left hip." R. 414

(Ex. 11F15-17). Dr. Mullin opined that the best approach was to use Vicodin 5 mg

three times a day for reasonable pain control and to return on an as needed basis.

R. 414-16. Thus ends Plaintiff's treatment by Drs. Cuffe and Mullin. Thereafter,

Plaintiff was treated mainly by Dr. Serio for her back pain.

The ALJ also discusses the examinations and treatments of Plaintiff's right

shoulder and makes the following findings:

> The claimant underwent multiple MRIs in 2006, which revealed degenerative
> changes involving the right shoulder acrimioclavicular joint and mild
> degenerative changes involving her bilateral left hip joints without evidence of
> bursitis or necrosis (Ex. 2F16, 2F21). The claimant underwent a rotator cuff
> repair of a 1.5-2 mm tear in her tendon on October 2006 and a year later, she
> reported stiffness, but not severe pain (Ex.12F1). In October 2007, Mark E.
> Fahey, M. D., opined that although he expected the claimant's injury to be
> permanent, she could still perform some work with limitations, such as restricted
> overhead lifting (Ex.12F1). Dr. Fahey also observed that the claimant was
> "moving better" and he recommended physical therapy, stretching and massage
> (Ex. 12F6). A May 2008 ultrasound of the claimant's left lower extremity
> revealed normal findings (Ex. 1F1). Given the nature and length of Dr. Fahey's
> treating relationship with the claimant, I afford significant weight to his opinion.

R. 24.

Plaintiff first saw Dr. Fahey on June 20, 2006, for right shoulder pain due to a

rotator cuff tear and surgical repair is necessary. R. 433. The rotator cuff surgery

occurred on October 9, 2006. R. 348-51. On September 4, 2007, Plaintiff reported

remaining right shoulder stiffness and difficulty with activities despite physical therapy.

R. 353, 421. The right shoulder manipulation under anesthesia for adhesive capsulitis

was done on September 12, 2007. R. 419. Plaintiff underwent a second surgery for

right shoulder rotator cuff repair on October 9, 2007. R. 427-31.

On October 23, 2007, Dr. Fahey explained that Plaintiff never got her right

shoulder motion back and maintained stiffness of her shoulder that was more than

expected.   R. 417.   He opined that the shoulder injury was related to her accident

(2005 fall), and in three months she probably would reach maximum medical

improvement.   Dr. Fahey thought Plaintiff had "sustained permanent injury and even in

the best of situations she will have some loss of range of motion and she may have

some persistent aching pain."   R. 417.   Dr. Fahey opined, with respect to Plaintiff's

shoulder, she should be able to return to work with some limitations, and secretarial

work is reasonable; sewing and light catering activities are probably reasonable.   Any

lifting of heavy trays, pots or pans or any overhead work, however, "would probably be

the more problematic aspect to this."   R. 417.[8]   This appears to be Plaintiff's last

evaluation by Dr. Fahey.   Thereafter, Plaintiff was treated by Dr. Serio for shoulder

pain.

Plaintiff was first examined by Dr. Serio on January 29, 2007.   R. 440.   The ALJ

commented that Dr. Serio noted that in April 2007 Plaintiff informed Dr. Serio "that her

---

[8]   The ALJ incorporated part of Dr. Fahey's opinion when he determined Plaintiff's
RFC to the extent he found that Plaintiff could perform sedentary work and "could
occasionally reach overhead with her right upper extremity."   R. 22.   This is consistent
with Dr. Fahey's opinion that Plaintiff could do secretarial work despite her limitations and
the vocational expert's testimony that Plaintiff could perform jobs as a receptionist.
R. 67.   The ALJ accounted for Plaintiff's claimed difficulties with standing, walking, and
lifting heavy objects by limiting her to sedentary work.   He also accounted for her
postural limitations by limiting her to work that involved no more than occasional
balancing, stooping, kneeling, crouching, crawling, or climbing.   As noted, he accounted
for her difficulties with using her right arm for overhead activities by limiting her to jobs that
involved no more than occasional overhead reaching with her right upper extremity.
And, the ALJ accounted for Plaintiff's environmental limitations by limiting her to jobs that
did not involve concentrated exposure to workplace hazards.

back pain was improving and that she was experiencing 'no problems at all.'  R. 24, 438; *see supra* n.4.)   By June 20, 2007, Dr. Serio noted, however, that Plaintiff reported her back pain with radiculopathy was getting worse as she was having difficulty obtaining Mobic through her insurer.   R. 437.   Dr. Serio continued to examine and treat Plaintiff through Plaintiff's last date insured and thereafter.

Aside from referring to Dr. Serio's patient note of April 2007, R. 24, the ALJ does not mention any other patient notes notwithstanding Dr. Serio's lengthy treating physician relationship with Plaintiff from January 2007, to approximately December 2010.   Rather, the ALJ refers to the last of three RFC questionnaires submitted by Dr. Serio in December 2010 wherein Dr. Serio essentially concludes that Plaintiff cannot work.   R. 24-25, 615-16.   (Dr. Serio completed his first RFC assessment on August 12, 2008, R. 474-77, and second on April 23, 2010, R. 560-62, and the ALJ refers in passing to these questionnaires, R. 25.)

The ALJ stated that Dr. Serio was Plaintiff's treating physician, but afforded "his opinion little weight because it is inconsistent with the medical evidence of record, with the claimant's own statements concerning her abilities, and with the observations of others (Ex. 4E, 11E, 12F)."   R. 25.   Exhibit 4E is an April 7, 2008, pain questionnaire, R. 189-93; Exhibit11E is a disability report, R. 217-23; and Exhibit 12F is the treatment record from Dr. Fahey, R. 417-34.

Although there are some patient notes from Dr. Serio that do not mention back and shoulder pain, the majority of the patient notes describe Plaintiff's reported symptoms and Dr. Serio's observations and course of treatment, which is relatively conservative most

likely because she had exhausted efforts at surgery, particularly after having two shoulder surgeries.

The ALJ also refers to Dr. McKay's consultative psychological examination in June 2008, in which he determined that Plaintiff had no mental impairment, R. 25, 456-57; Dr. Conger's July 24, 2008, PRT in which he opined Plaintiff had no medically determinable mental impairment, R. 25, 460; and Dr. Cormier's September 17, 2008, PRT, R. 25, 486, 498, in which she opined that Plaintiff did not have a medically determinable mental impairment prior to her date last insured.   The ALJ afforded significant weight to these opinions.   R. 25.   (Plaintiff, however, does not claim to be mentally impaired.)

The ALJ also refers to Dr. Peele's May 19, 2008, physical RFC assessment. R. 24, 448-55.   Dr. Peele opined that Plaintiff was capable of performing light exertional activity with occasional postural limitations such as no more than occasional climbing, balancing, stooping, kneeling, crouching, and crawling and no concentrated exposure to hazards.   *Id.*   As stated by the ALJ, Dr. Peele also "observed that the claimant's systems were out of proportion to the objective medical findings and, as such, he assessed her as only partially credible (Ex. 15F6)."   R. 24.

The ALJ refers to Dr. Holifield's subsequent September 17, 2008, physical RFC assessment.   R. 24.   Dr. Holifield indicated that he disagreed with the examining or treating source opinions, and instead opined that Plaintiff could perform light exertional activity.   R. 478-85.   The ALJ determined, however, that Dr. Holifield had not "adequately considered the claimant's subjective complaints."   R. 24.   Thus, the ALJ

"afforded his opinion little weight."   R. 24.   But, the ALJ afforded Dr. Peele's opinion "significant weight" "as it is generally consistent with the medical evidence of record, except that [the ALJ found Plaintiff's] overall exertional capacity to be less than that assessed by Dr. Peele."   R. 24.

Generally, the Commissioner gives more weight to opinions of a claimant's treating sources such as physicians "since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations."   20 C.F.R. § 404.1527(c)(2).

In determining Plaintiff's RFC, the ALJ included consideration of Plaintiff's ability to only occasionally balance, stoop, kneel, crouch, crawl or climb; occasionally reach overhead with her right upper extremity; and avoid concentrated exposure to workplace hazards.   R. 22*; see supra* n.8.   These limitations are supported by the treatment notes and opinions of treating physicians, Dr. Cuffe and Dr. Fahey, and non-examining physician, Dr. Peele.   These limitations are not supported by the overall treatment notes of treating physician, Dr. Serio, and his opinions, and of late, his December 2010 assessment.

On review, the Court may not re-weigh the evidence or substitute its own judgment for that of the ALJ even if it finds that the evidence preponderates against the ALJ's decision.   *See* Moore v. Barnhart, 405 F.3d at 1211.   Although judicial review of the

ALJ's findings is limited to the substantial evidence standard, no similar presumption of validity attaches to his legal conclusion about the proper standards to be applied in evaluating claims.   *Id.*

Resolution of this case is somewhat complicated because Plaintiff has the burden to prove she does not have the ability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."   42 U.S.C. § 423(d)(1)(A); *see* 20 C.F.R. § 404.1509 (duration requirement).   Both the "impairment" and the "inability" must be expected to last not less than 12 months.   Barnhart v. Walton.   In addition, Plaintiff is entitled to DIB *only* if she is under a disability prior to the expiration of her insured status, here December 31, 2007.   *See* 42 U.S.C. § 423(a)(1)(A) and (d); Torres v. Sec'y of Health & Human Servs., 845 F.2d at 1137-38; Cruz Rivera v. Sec'y of Health & Human Servs., 818 F.2d at 97.

The ALJ correctly focused on the medical evidence and Plaintiff's situation prior to December 31, 2007, especially at the hearing.   R. 39-40.   The ALJ did not expressly comment on Dr. Serio's 2007 and early 2008 patient notes, except by a limited reference to his April 2007 notes, and only referenced Dr. Serio's August 12, 2008, RFC assessment in passing, R. 25, in which he opined that Plaintiff would not be able to stand or walk during the workday and "cannot either sit or stand for an extended period"; could do no lifting, and could not perform repetitive movements; could reach above her shoulder level, "but not both hands"; was unable to bend squat, crawl, and climb; that

Plaintiff's use of a hand-held assistive device was medically required for even occasional walking or standing; and that she would not be able to sustain work activity for a regular 40-hour week.   R. 474-77.   This assessment and Dr. Serio's later two assessments are not, however, conclusive.[9]   *See generally* Teague v. Astrue, 638 F.3d 611, 615 (11th Cir. 2011) (check-off form insufficient as unsupported by clinical test results or findings and prior treatment notes reporting any significant limitations due to back pain).

The ALJ's findings are supported by the patient notes and opinions of Dr. Fahey, *see, e.g.,* R. 417, and Dr. Cuffe, *see, e.g.,* R. 371, and, as noted by the ALJ, "the objective medical findings in this case fail to provide strong support for [Plaintiff's] allegations of disabling symptoms and limitations."   R. 23-24.   The ALJ's analysis of and the weight given to the non-treating, consultants' reports are also supported by substantial evidence. R. 24.   Likewise, the ALJ's credibility determinations of Plaintiff are also supported by substantial evidence.   R. 25.

On the other hand, some record evidence detracts from the ALJ's conclusions, particularly a majority of Dr. Serio's patient notes and his three assessments detailing his observations (over time) of Plaintiff's limited functionality in light of her complaints of pain. Dr. Serio provided the ALJ with a "longitudinal picture" of Plaintiff's impairments for over an almost four-year period.   The majority of Dr. Serio's patient notes do not support the ALJ's findings.   Rather, they paint a picture of a claimant who has been in pain off and on as reported by Plaintiff and, according to Dr. Serio, cannot perform required work

---

[9]   The Commissioner has the responsibility to determine whether a claimant is disabled and "[a] statement by a medical source that [a claimant] is "disabled" or "unable to work" does not mean that [the Commissioner] will determine that [a claimant is] disabled."   20 C.F.R. § 404.1527(d)(1).

activities on a sustained basis even at the sedentary level.

Nevertheless, although this is somewhat of a close call, substantial evidence supports the ALJ's conclusion to give "little weight" to Dr. Serio's opinion's, particularly considering the ALJ's credibility evaluation of Plaintiff. Indeed, many of Dr. Serio's patient notes document Plaintiff's symptoms as reported by Plaintiff. *See, e.g.*, R. 435-40. In addition, as referenced by the ALJ, some of Dr. Serio's records reflect that Plaintiff appeared better or improved. For example, the ALJ referred to Dr. Serio's observation that Plaintiff "appeared to be in no apparent distress," citing Exhibit 13F, which contains Dr. Serio's patient notes from January 29, 2007, to February 11, 2008. R. 24, 435-446. Dr. Serio made this observation on January 29, 2007, April 13, 2007, July 13, 2007, and February 11, 2008, all set forth in Exhibit 13F. R. 435-36, 438, 440. Dr. Serio made similar observations in later patient notes on May 12, 2008, March 11, 2009, April 27, 2009, and July 30, 2009, R. 520-23, 525. *See* n.4 and *supra* at 13. The ALJ also noted that on April 13, 2007, Plaintiff told "Dr. Serio that her back pain was improving and that she was experiencing 'no problems at all' (Ex. 13F4) [R. 438]." R. 24. As noted previously, there are other patient notes that support Plaintiff's claim, but they do overcome the substantial evidence supporting the ALJ's findings.

Based upon the foregoing, substantial evidence supports the ALJ's findings and he appropriately followed controlling law.

## VI. Conclusion

Considering the record as a whole, the findings of the Administrative Law Judge were based upon substantial evidence in the record and he correctly followed the law. Accordingly, it is **RECOMMENDED** that the decision of the Commissioner to deny Plaintiff's application for Social Security benefits be **AFFIRMED**.

**IN CHAMBERS** at Tallahassee, Florida, on May 1, 2013.


s/   Charles A. Stampelos
**CHARLES A. STAMPELOS**
**UNITED STATES MAGISTRATE JUDGE**


## NOTICE TO THE PARTIES

**A party may file specific, written objections to the proposed findings and recommendations within 14 days after being served with a copy of this report and recommendation.   A party may respond to another party's objections within 14 days after being served with a copy thereof.   Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**